UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                        CASE NO. 8:20-cr-120-WJJ-JSS

STEVEN CHUN, ET AL

UNITED STATES' RESPONSE IN OPPPOSITION TO
DEFENDANT CHUN'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE AT
TRIAL/OBJECTION TO GOVERNMENT'S RULE 404(b) EVIDENCE

    The United States (or the government) hereby submits its response in opposition to Defendant Chun's Motion *in Limine* to Exclude Evidence at Trial and Objection to Government's Rule 404(b) Evidence. As explained below, the Court should deny the Motion and the relief requested therein.

**FACTUAL BACKGROUND**

    The Superseding Indictment (Dkt. 67)[1] charges defendants Steven Chun (Chun) and Daniel Tondre (Tondre) with a conspiracy with two objects—to solicit and receive kickbacks and bribes and to offer and pay kickbacks and bribes—in return for the increased writing and approval of Chun prescriptions written for Subsys, which was paid for, in whole or in part, by Medicare. Defendants are also charged with five substantive counts each of offering or paying kickbacks (Tondre) and soliciting or receiving kickbacks (Chun) in return for Subsys prescriptions. Finally, there are five counts of identification fraud for the unlawful use of

---

[1] The Superseding Indictment, returned on February 15, 2022, charges the same crimes as the original indictment. (Dkt. 1).

practitioners' names and identification numbers on sign-in sheets used in connection with the kickback conspiracy.[2] Tondre was hired by Insys Therapeutics (Insys) to be the Subsys sales representative assigned to Chun, a Sarasota, Florida pain management doctor. Tondre had a previous work relationship with other Insys management personnel, including Alec Burlakoff, from a prior pharmaceutical job that marketed a fentanyl competitor (Actiq), and according to Burlakoff, Tondre was known for incentivizing doctors with speaker programs.

Subsys is a liquid form of fentanyl to be applied under the tongue, or sublingually, that was developed and owned by Insys. Subsys was approved in January 2012, by the United States Food and Drug Administration (FDA) for the management of breakthrough cancer pain in opioid tolerant patients, and was in a category of fentanyl-based rapid onset opiate drugs known as Transmucosal Immediate Release Fentanyl (TIRF) products. Because of the risk of misuse, abuse, addiction, and overdose associated with TIRF drugs, the FDA designed and mandated a TIRF Risk Evaluation and Mitigation Strategy (TIRF REMS) program, which required TIRF REMS enrolled prescribers like Chun to certify and acknowledge that TIRF drugs, including Subsys, were "indicated only for the management of breakthrough pain in patients with cancer, who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent pain" and that "the initial starting dose for TIRF medicines is

---

[2] Each of the acts charged in the substantive counts are included as overt acts in furtherance of the kickback conspiracy charged in Count 1.

2

the lowest dose…and that patients must be titrated individually." Subsys was an expensive TIRF drug ranging in strengths from 100 to 1600 micrograms (mcgs).

In specific, Count One alleges that the defendants participated in a scheme in which Insys induced high-prescribing doctors to prescribe Subsys through falsely designating payments to Chun as "honoraria" for conducting speaker programs, many of which were a sham, with only the façade of a speaking event. At Chun's speaker events, there were multiple repeat attendees; inappropriate audience of practitioners and/or staff, family or friends; limited or no presentation by Chun; and the events were documented with false and fraudulent speaker program sign-in sheets that included the names, forged signatures and identification numbers of licensed practitioners who did not attend the speaker event. For these sham speaker events, Chun was paid $2400 to $3000 per event for nearly 100 events, for a total payment of over $275,000 from Insys.

Further, Insys also designed and implemented a program to hire and pay Area Business Liaisons (ABL) to work, in most cases, at the offices of large Subsys-prescribers, like Chun, as a further kickback to facilitate and increase prescriptions and dosages of Subsys and ensure approval of insurance forms. ABLs often worked in the a physician's office to assist with the processing of prior authorizations, thereby reducing the physician's overhead, including Chun. In this case, Insys also hired Chun's girlfriend, to further induce Chun to prescribe Subsys.

To insure that claims for Subsys, including Medicare claims, were paid, Insys also designed and implemented the Insys Reimbursement Center (IRC) to facilitate

the approval of prior authorizations and insurance forms that ensured approval and payment of Subsys prescriptions by providing false and misleading diagnoses. For Medicare claims, approval is based on the medically-accepted indication—breakthrough cancer pain. The IRC worked Tondre, his ABLs, and with Pharmacist 1 to obtain approval and payment of Subsys for Chun's patients, including payments by Medicare. Pharmacist 1, who purported to attend over 50 Chun speaking events, including two purported events at his pharmacy, made separate payments to Chun as a purported consultant that totaled over $330,000.

## PROCEDURAL BACKGROUND

As required by Rule 404(b) and in the Court's pretrial discovery order,[3] the government provided the notice, both by letter (attached to Defendant's motion) and in a Court pleading (Dkt. 62)[4] setting forth several types of evidence, including intertwined evidence, along with non-propensity purposes for admissibility under Rule 404(b), including motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. The items Defendant contests in his motion are likely only to be raised by the government in cross examination, if at all.

---

[3] As to the timing of the government' notice, the parties agreed on the January 1, 2022, deadline, both at an informal status meeting held at the government offices in August 2021, and again in follow-up letter dated September 10, 2021. Otherwise, the date under the Court's pre-trial order would have been earlier. *See* Dkt. 34 at 5-6. Through these communications, defense counsel was notified of the government's potential and unchanged theories regarding the items listed in Dkt. 64.

[4] The only difference between the government's December 31 letter and the Court pleading is that individuals were identified by their full name in the letter to counsel and not in the publicly filed notice so as to compile with local rules regarding personally identifying information. Hereinafter, the are collectively referred to as the government's notice.

The fifth item raised by Defendant, the death of a Chun patient after filling a 1600 mcg Subsys prescriptions six days before his death, was not listed in the government's notice. As such, it may be subject to a motion to exclude should the government attempt to introduce such evidence at trial, which it does not.[5]

A determination of whether this evidence is admissible, relevant, or material, can be made by the Court once the evidence is (1) requested to be presented by the government, (2) for a specific purpose, and (3) is admissible under a particular Rule of Evidence (with or without a request for a limiting instruction). As such, Defendant's motion is premature, in addition to being factually incorrect, and the Court should deny the motion until such a motion *in limine* would be properly before the Court and ripe—if and when such testimony and evidence is requested by the government to be presented at trial.

## ARGUMENT

A. <u>Rule 404(b) Standard.</u>

In 2020, Fed. R. Evid. 404(b) was amended in criminal cases to clarify and reflect the necessity of adequate notice to defendant and remove any element of

---

[5] The records relating to the death of Chun's patient, Gregory Smith, were produced to defendants upon the government's receipt and pursuant to the government's ongoing discovery obligations. Previously provided in discovery, Chun's Florida's E-FORCSE (Florida's prescription drug monitoring program) records established that Mr. Smith received a prescription written by Dr. Chun for 1600 mcg of Subsys, the highest dosage, which was dispensed at Familycare Pharmacy on September 3, 2014. Smith died of fentanyl toxicity, according to his death certificate, on September 9, 2014. As noted by Defendant in our email correspondence, the government does not believe this evidence is relevant to its case, nor does it seek to admit this evidence at this time.

5

"unfair" surprise. In the Committee Notes to the Rule, the prosecution was directed to "not only identify the evidence that it intends to offer pursuant to the rule but also articulate a non-propensity purpose for which the evidence is offered and the basis for concluding that the evidence is relevant in light of this purpose." 2020 Comm. Notes, Fed. R. Evid. 404(b). Previously, only the "general nature" of the evidence was typically "understood by some courts to permit the government to satisfy the notice obligation without describing the specific act that the evidence would tend to prove, and without explaining the relevance of the evidence for a non-propensity purpose." *Id*. Clearly, a more thorough description of the specific act is now required. The government did so both in its letter to defense counsel (Dkt. 64-1) and in the notice to the Court. (Dkt.62).

Although the Court is well aware of the law regarding admissibility of 404(b) in the Eleventh Circuit, there are some salient points to consider as to the items listed in the government's notice. *See e.g., United States v. Tercero*, 859 F. App'x 506, 507–08 (11th Cir. 2021); *United States v. Sanders*, 668 F.3d 1298, 1314 (11th Cir. 2012) ("Rule 404(b) 'is one of inclusion which allows extrinsic evidence unless it tends to prove *only* criminal propensity.") Generally, for such evidence to be admissible, "(1) it must be relevant to an issue other than a defendant's character; (2) there must be sufficient proof of the prior act to allow a jury to determine that the defendant committed the prior act; and (3) the evidence's probative value must not be substantially outweighed by undue prejudice and otherwise meet the requirements of Rule 403." *Tercero*, 859 F.App'x at 507–08; *see also United States v. Nerey*, 877 F.3d

6

956, 975 (11th Cir. 2017) (in kickback case, evidence was "relevant, probative, and inextricably intertwined" but court also found the evidence was admissible under 404 to show motive and lack of mistake.)

"A decision on the third prong, 'lies within the sound discretion of the district judge,' and it requires consideration of, among other things, 'prosecutorial need, overall similarity between the extrinsic act and the charged offense, [and] temporal remoteness.'" *Tercero,* 859 at 507 (*citing United States v. Calderon*, 127 F.3d 1314, 1332 (11th Cir. 1997)); *see also United States v. Roberts*, 735 F.App'x. 649, 652 (11th Cir. 2018) (upholding the admittance of 404(b) evidence, where "[t]he prosecutorial need for evidence of intent was strong," based on the fact that "the Government's other evidence of Roberts' intent was circumstantial") (*citing United States v. Calderon*, 127 F.3d 1314, 1332 (11th Cir. 1997)). "A similarity between the other act and a charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense." *Id.* (*citing United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005)). On the other hand, though, the "more closely the extrinsic offense resembles the charged offense, the greater the prejudice to the defendant," since it increases "[t]he likelihood that the jury will convict the defendant because he is the kind of person who commits this particular type of crime or because he was not punished for the extrinsic offense." *Id.* (*citing United States v. Beechum*, 582 F.2d 898, 915 n.20 (5th Cir. 1978)). The Court can give a "limiting instruction after the close of evidence [to] lower the risk of undue prejudice to a defendant;" and such instructions are presumed to be followed by a jury. *Id.*

    B.    <u>The evidence in Defendant's motion is not subject to pretrial exclusion without hearing how the evidence and testimony are presented at trial, and the Court should not make a pretrial determination of admissibility.</u>

At the outset, Defendant's comments about what the government's evidence will or won't prove at trial (*see* Dkt. 64 at 7-8) are premature, speculative and left for determination by a sworn jury after hearing all admissible evidence. Defendant's motion correctly cites the rules that may be relevant in the determination of admissibility, but these rules do not dictate exclusion or a pre-trial determination of admissibility at this time, as Defendant argues. *See* Fed. R. Crim P 404(b); Fed. R. Crim. P 401—403 (relevance), Fed. R. Crim. P. 608 (impeachment).

Although the government largely disagrees with the recitation of the facts by Defendant at pages three through six of his motion, the government does agree with defense counsel (as the government has always represented), that these items are not part of the government's case-in-chief, and may arise in cross examination, either through government witnesses, or more likely, should defendant make the decision to testify at trial. Contrary to Defendant's assertions, the government does not seek to "chill Dr. Chun's ability to defend himself and testify in his defense," nor is the government "threatening to smear him with unfair, unfounded, and highly prejudicial extraneous allegations." (Dkt. 64 at 18). Rather, the government is trying to provide notice to Defendants and the Court of the entire possible range of evidence that *may* be relevant at trial.

In lengthy discussions with counsel, defense counsel questioned whether such evidence could ever be admissible at trial, and the undersigned speculated about

hypothetical scenarios that could apply that would make a potential piece of evidence relevant, in order to put the defendant on notice, even before filing its 404(b) notice. The government was unaware of the Defendant Chun's theory of defense, until it was suggested in his motion. In the government's notice, many of the items were listed with the caveat that the request to admit such evidence was "depending upon the theory of defense" presented at trial. Depending upon defense counsels' cross examination of a government witness, one or more of the listed pieces of evidence *could* become relevant.

Defendant's request that the Court make a determination now – without the benefit of seeing the trial unfold – is contrary to the normal practice of trials. This Court should address the evidentiary issues as the trial unfolds and with the benefit of seeing the evidence that has come in and placing the proffered evidence into context. As the First Circuit has recognized, such a "wait-and-see stance" is reasonable and "a court is not required to make judgment calls about admissibility *a priori* and out of context." *United States v. Noah*, 130 F.3d 490 (1st Cir. 1997) (affirming district court's decision denying a motion *in limine* without prejudice to later objection and thus taking a "wait-and see stance" on 404(b) evidence); *see also United States v. Carter*, 2022 WL 212691 (M.D. Ala. Jan. 24, 2022) (finding that 404(b) evidence in government's notice "will likely depend on the other evidence presented by either party").

It is near certain that the government will not seek to introduce all of the evidence that the Defendant has outlined in the motion, and issues may narrow or

9

expand during the course of the trial before the Court must decide admissibility. None of the issues could arise at trial. Other issues could arise. Different issues could arise. None of the evidence listed could be relevant or material, or portions could be relevant. If relevant, certain limiting instructions could and/or should be given in connection with a piece of evidence. Thus, the Court should reserve ruling on the potential 404(b) evidence until, and if, the government seeks to present evidence at trial. The United States will seek a determination of the Court prior to the introduction of or cross-examination regarding any of the evidence at issue in Defendant's motion.

And, should the Defendant(s) testify, pattern jury instructions direct the jury to "decide whether you believe the Defendant's testimony in the same way as that of any other witness. *See* 11th Circuit Pattern Jury Instr. B6.3 and B5; *see also United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005) (upholding the introduction of 404(b) evidence found to be "relevant to . . . the truthfulness of [the defendant's] testimony" was used for impeachment with a limiting instruction in a drug boat case where the defendant claimed no acquaintance with co-conspirator but had been arrested with co-conspirator in similar circumstances in earlier case); *United States v. Boon San Chong*, 829 F.2d 1572, 1576 (11th Cir. 1987) (upholding the introduction of 404(b) evidence with a limiting instruction in an extortion case, to rebut defendants testimony that he acted under duress); *United States v. Perez-Garcia*, 904 F.2d 1534, 1545 (11th Cir. 1990) (upholding the introduction of 404(b) evidence for impeachment in a drug conspiracy case, where the defendant claimed not to recall

being on boat with co-conspirator).

Finally, the government disputes the Defendant's assertions that the trial would "last much longer"[6] should the government "be permitted to present evidence and testimony to rebut certain allegations." Dkt. 64 at 2. Many of the items listed in Defendant's motion are not part of the government's case-in-chief, thus they would not lengthen the trial and would be *possible* areas that *could* arise in the Defendant's case, should the Defendant testify and/or through cross examination of government witnesses. As such, it would not extend the two-week estimate of the time the government anticipated to present its case-in-chief (dependent upon the length of cross examination).

C. <u>Defendant's Motion Misstates the Evidence</u>.

The government specifically addresses below each items Defendant listed as numbers (1) through (4) in his motion (Dkt. 64 at 6-7). Other than the purported consulting agreement and payments between Pharmacist 1 (identified as Vishal Doshi[7]) and Chun, the government does not intend to present them in their case-in-chief, and if the issues arise, it is likely to happen during cross examination.

---

[6] Defendants loosely asserted in his motion that the trial "is expected to take 2-3 weeks." Dkt. 64 at 2. The time of trial remains unchanged since the first status conference in this case, which took place after the first motion to continue, in January 2021 (Dkt. 51), wherein the government stated that its case-in-chief would take 2 weeks, providing for 5 days per week of testimony, and each defendant requested one week for its defense, for a total of 4 weeks of trial.

[7] Although the government identified him as Pharmacist 1 in the Superseding Indictment and in the government's notice (Dkt 62), because the Defendant identified him as Vishal Doshi both in their motion and in the attachment (Dkt. 64, 64--1) and his identity as is now part of the public record, the government will refer to him by name in its response.

> 1) *Chun's prior False Claims Act (FCA) Case and Statements to Law Enforcement During Search of Chun's Medical Practice*

Per the settlement agreement, dated in March 2014 (during the time of the charged conspiracy), the covered conduct is as follows: "Dr. Chun knowingly submitted Medicare claims for: (1) patient evaluation and management services that were not rendered; (2) patient evaluation and management services billed at a higher level of service than actually rendered; (3) refills of implantable infusion pumps as if performed by a physician, when they were performed by a nurse; and (4) injections that were not rendered." Dr. Chun entered into and submitted reports to HHS under an integrity agreement for a number of years thereafter. Per most *qui tam* settlements, there is not usually an admission of liability, nor a concession by the United States that its claims are not well-founded. The government could not, therefore, by the terms of the agreement, seek to impermissibly "stain Dr. Chun's character with evidence suggesting he long ago did something dishonest" which would be in direct contravention of Rule 404(b). *See* Dkt. 62 at 2 for the government's position as to the FCA case and to the statements made by Dr. Chun in connection with a search warrant executed in that investigation.

> 2) *Chun's Addiction*

Contrary to Defendant's contention, the government does not seek to admit evidence of Chun's pain medication addiction at trial "simply" to make him "look bad before the jury" or because it bears on whether Chun treated patients "within the confines of medical necessity." Dkt. 64 at 17. *See* Dkt. 62 at 3 for the non-propensity

purposes of any testimony regarding Chun's addiction should it arise in cross examination.

Defendant's narrative of his pain medication addiction in his motion (Dkt. 67 at 16-18) is disputed by witnesses interviewed by the government, including his then-girlfriend, Aqsa Nawaz, and Vishal Doshi.[8] Nawaz, who reported extensive personal knowledge of Chun's addiction and detox treatments, testified about Chun's addiction in *United States v Simon et al,* 12 F.4d 1 (1st Cir. 2021) (cert. pending). *See* Attachment A (trial transcript of Nawaz redirect testimony, and the sidebar conference relating about the admissibility of evidence of Chun's addiction and his prior FCA settlement after one of the defense counsel's cross examination of Nawaz, who is anticipated to testify for the government in this case.) As noted therein, the Court allowed *very* limited inquiry into Chun's addiction (*see* Bates numbered page GURRY-06845) because the court found that defense counsel had opened the door (and disallowed any inquiry regarding Chun's FCA case). Not knowing what testimony will be elicited on cross examination, the government provided the 404(b) notice, in an abundance of caution.

3) *Chun's Business Relationships*

Contrary to Defendant's contentions, the government does not allege that

---

[8] Doshi dispensed personal prescriptions to Chun and thus was aware, and concerned, about Chun's addiction. When interviewed, Doshi reported that at one time in 2011 or 2012, he confronted Chun and refused to fill his prescriptions. Chun also wrote prescriptions to his family members for Actiq (which Doshi suspected were really for Chun) and hydrocodone around the same time, which were dispensed at Doshi's pharmacy and reportedly delivered to Chun's home by Nawaz.

"every job or business venture" by Chun "would be relevant and admissible at trial" and does not throw "a bunch of Rule 404(b) terms at the wall to see what sticks." Dkt. 64 at 14. Instead, pursuant to the Rule, the government identifies three specific business ventures: two business ventures that Chun entered into with the same individual, both of which Chun referred business to and earned money from services that he used in the treatment of his patients (for pain pumps and urine screens) and one purported consulting venture with Pharmacist 1—Vishal Doshi, who dispensed the vast majority of Chun's patient's prescriptions, including Subys, and is named an unindicted co-conspirator. Contrary to Defendant's claim, this evidence is not "just classic propensity and bad character evidence" or "just code" that Chun is a "greedy, bad man" as Defendant argues. Such an argument not only completely misstates the government's position, but would run afoul of the Rules of Evidence. *See* Dkt. 62 at 2-3 for the government's position on these business ventures.

      The government will address most of its response to Chun's relationship with Vishal Doshi because contrary to the other items listed, the government intends to present evidence relating to Doshi in its case-in-chief, and believes that such conduct is intertwined with the charged conspiracy.[9] Despite Defendant's hearsay arguments and fabrications of why Chun referred patients to Vishal Doshi's pharmacy (as set forth in self-serving detail on pages five and six of his motion), Chun's purported

---

[9] Alternatively, because the conduct occurs during the same time period, Chun and Doshi's venture may also be relevant for a number of non-propensity issues such as motive, knowledge/lack of mistake, and credibility/impeachment.

14

consulting arrangement with Pharmacist Vishal Doshi is part of the charged conspiracy in Count 1. *See* Dkt. 67 at ¶ ¶ 13(o) and 14(e). Defendant's contentions (in this motions and others) that this business relationship is "wholly unrelated" to his business relationship with Insys is simply not born out by the facts. Instead, it is one of many of the manner and means and overt acts performed in furtherance of the objects of the conspiracy – to induce Chun to write more Subsys prescriptions in return for renumeration.

The consulting agreement between Chun and Vishal Doshi was entered into *at around the same time* that Chun agreed with the Insys Vice President of Sales and others to engage in the kickback scheme in August 2012.[10] The timing of Chun's purported consulting agreement with Doshi is telling. The $1500 per hour consulting payments from this earlier executed contract did not begin until *after* Dan Tondre was hired (in March 2013), Chun's sham speaker events began in earnest (sometimes up to eight or nine events in one month) and Chun's Subsys prescriptions had risen significantly.[11] Mr. Doshi's payments to Chun under the purported consulting

---

[10] When interviewed, Doshi reported that Chun told him that the only legal way for Doshi's pharmacy to pay Chun, who referred all of his prescriptions to the pharmacy, was through a "consulting agreement" between the two of them. Chun's statements to Doshi clearly tie his prospective prescription referrals to payments, which is a hallmark of an illegal kickback arrangement. Another example of this kickback arrangement, Chun filled his personal prescriptions at Doshi's pharmacy. At one point, per Doshi, such payments from Chun totaled $7,000. Thus Doshi conveyed another financial benefit to Chun, usually paid though Chun's then-girlfriend, Aqsa Nawaz, who worked for Doshi (before she went to work as an Insys ABL). Before the consulting agreement was in place and Doshi paid Chun by check, Doshi paid Chun through Nawaz, sometimes subtracting the monies owed for his personal and family prescriptions to the monies he paid Nawaz that he owed to Chun.
[11] When interviewed, Doshi reported that he did not have the money to pay Chun until that time.

arrangement ranged from $10,000 to $40,000, and totaled over $330,000 during the time of the conspiracy, paid in 13 separate checks.[12]

Moreover, Vishal Doshi purported to attend 55 of Chun's speaker events, and several of his sign-in sheets appear to be forged or fraudulent (as do those of his wife, also a pharmacist who purportedly attended several of Chun's speaker events). Tondre also organized two purported lunchtime speaker events held at Doshi's pharmacy, for which Chun was paid $2400 for each event.[13] Doshi worked closely with Tondre and the IRC manager (Liz Gurrieri and her staff) to assure that Chun's Subsys prescriptions were approved.

The government's contention is that at that time Chun knew that in return for soliciting and receiving speaker fees from Insys, he would need to write more and higher (more expensive) dosages of Subsys. To fund the speaker program, Insys also needed to assure approvals (called prior authorizations) so that Medicare and other federal healthcare programs paid the claims for Subsys. Doshi and his staff, including Chun's then-girlfriend, worked with Tondre and the IRC to ensure approvals of Chun's Subsys prescriptions. And for Chun, the opportunity to make additional money (if not more) for the same conduct from "consulting" fees paid by Doshi was

---

[12] In his certified business records, Doshi provided only 5 one-page handwritten invoices that summarized the "services" Chun allegedly provided to his pharmacy. Some of the checks for the larger amounts like $37,000 and $40.000 do not have corresponding invoices, and the writing on those checks and at least two other Doshi checks appear to be in Chun's handwriting. Although outside the charged conspiracy, there are also 3 other $20,000 checks from Doshi to Chun on April 20, 2016. Also in 2016, Doshi paid for a first-class trip to India for Chun and his mother/sister that Doshi estimated cost $35,000.
[13] When interviewed, Doshi only recalled one such event.

16

a further inducement and renumeration made in return for Chun's already increasing Subsys-prescribing.

## CONCLUSION

Accordingly, the Court should deny the Defendant's motion to exclude and to make a pretrial determination for each of the items raised by Defendant. The government submits that the Court should defer and address the evidentiary issues presented by Defendant at trial with the benefit of seeing the context of the evidence and testimony that has been admitted. At that time, if and when such testimony and evidence is requested by the government to be presented at trial under the appropriate Rules of Evidence, such a motion would be properly before the Court, but the government submits it is not now.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By: /s/ Kelley C. Howard-Allen
Kelley C. Howard-Allen
Assistant United States Attorney
Florida Bar No.: 0085464
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
E-mail: Kelley.Howard@usdoj.gov

U.S. v. Steven Chun, et al.                    Case No. 8:20-cr-120-WJJ-JSS

**CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Mark P. Rankin, Esquire
Nicole Waid, Esquire
Roger Futerman, Esquire
Bjorn Brunvand, Esquire

By:  */s/ Kelley C. Howard-Allen*
Kelley C. Howard-Allen
Assistant United States Attorney
Florida Bar No.: 0085464
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Kelley.Howard@usdoj.gov